IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**MASON W. GOODKNIGHT**, an individual,

                    Plaintiff,                             Case No. 6:24-cv-00088-MC

     v.                                    **OPINION AND ORDER**

**COUNTY OF DOUGLAS**, an Oregon
Public Body,

                    Defendant.

_____

**MCSHANE, Judge**:

       Plaintiff Mason W. Goodknight brings this religious discrimination action against his former employer, Defendant Douglas County. Defendant moves to dismiss Plaintiff's fifth and sixth claims, each brought under the First Amendment. Def.'s Mot. Dismiss, ECF No. 9. Defendant does not move to dismiss Plaintiff's claims brought under Title VII and ORS 659A.030(1)(a). Because Plaintiff's allegations conclusively establish that (1) he spoke as a public employee and not as a private citizen; and (2) the challenged policy is a neutral policy applying to all jail employees, Defendant's Motion to Dismiss (ECF No. 9) is GRANTED.

## **BACKGROUND**[1]

---

[1] At the motion to dismiss stage, this Court takes all of Plaintiff's allegations as true. *See Burget v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000).

In 1996, Defendant hired Plaintiff as a Deputy Sheriff and guard at the Douglas County

Jail. First Am. Compl. ¶ 1, ECF No. 7 ("FAC"). Plaintiff's job duties at the jail require him to

work with adults in custody of all genders and all sexual preferences. FAC ¶ 12. Working with

such a population is no small matter for the Plaintiff, who identifies as "a practicing Christian

who cannot 'affirm' conduct he believes the Bible condemns. Such conduct, in Plaintiff's view,

include [sic] homosexual acts and cross-dressing." FAC ¶ 2. Plaintiff's beliefs are rooted in what

he holds as "traditional biblical view[s] of gender and sexuality:"

> Concerning gender, Plaintiff believes (1) God created all persons male and
> female; (2) a person's gender is determined by biology (DNA, genitalia, internal
> organs, etc.), not by how a person "self-identifies"; (3) gender is an immutable
> characteristic that cannot be changed regardless of what artificial attempts to
> change it a person undergoes, be it hormone treatments or surgical procedures;
> and (4) any "gender expression" – clothing, behaviors, that is inconsistent with
> the gender God created a person to be before birth is sinful. In other words, in
> Plaintiff's view, consistent with God's supreme authority as the author of
> creation, there is no such thing as a "transgender," "non-binary," or
> "genderqueer" person – there are only male and female people, and God never
> puts a male in a female's body, or vice versa.
>
> Concerning sexuality, Plaintiff believes all sex engaged in outside of marriage,
> which the Bible defines to be the exclusive lifelong union between one man and
> one woman, is sin. In Plaintiff's view sex "outside of marriage" includes
> homosexual conduct.

FAC ¶ 14.

In January 2023, Defendant instituted Jail Policy 620 ("JP620") which required all jail

employees, including Plaintiff, to:

> Use terms that [Defendant] considered LGBQI+ friendly and avoid using terms
> that [Defendant] deemed offensive to LGBQI+[] persons when dealing with
> AIC's who self-identified as LGBTQI+;
>
> House male AICs who self-identified as "female" with truly female AICs, or vice
> versa; and
>
> Conduct non-emergency pat-downs or strip searches of female AICs who self-
> identified as "male."

FAC ¶ 18 (citing JP620 at ex. A of FAC).

As to pat-downs and strip searches, Plaintiff's religious beliefs prevent him from touching "the private parts of any woman other than his wife." FAC ¶ 16. Given his beliefs, Plaintiff "could not . . . participate in strip searches or pat-downs of female AICs – not even female AICs who self-identified as 'male.'" FAC ¶ 16. Plaintiff's religious beliefs did however permit Plaintiff to conduct strip searches or pat-downs of female AICs in emergency situations, even when such searches involved "touching the private parts" of the female AICs.[2] FAC ¶ 17.

Defendant initiated JP620 "in accordance with the then-recently enacted federal Prison Rape Elimination Act ('PREA')[.]" FAC ¶ 18. Pursuant to JP620, Defendant required its employees to complete "LGBTQI Community Training" (the "Training"). FAC ¶ 19. Plaintiff alleges this Training required employees "to affirm and validate homosexual unions and the self-proclaimed 'transgender,' 'non-binary,' or 'genderqueer' identities of AICs and fellow employees." FAC ¶ 19. Amongst other requirements, the Training required employees to:

> Avoid using terms like "gay marriage" or "same-sex marriage" – which in [Defendant's] view, "suggest marriage for same-sex couples is somehow different than other marriages";
>
> Avoid using terms like "pre-op," "post-op," or "non-op," which concern whether an individual who self-identifies as "transgender" has undergone surgery to remove or change certain body parts (genitalia in particular), when referring to transgender persons. [Defendant] deemed the use of such terms offensive and an invasion of AIC's privacy;
>
> Use only those preferred terms that LGBTQI+ persons would purportedly deem acceptable;
>
> Use the self-selected names, prefixes ("Mr.," "Ms.," "Mx." Etc.), and pronouns of AICs who self-identified as "transgender," "non-binary," or "genderqueer";

---

[2] The FAC does not clarify whether Plaintiff's religious beliefs permitted such touching in emergency situations or, instead, whether Defendant would only accommodate Plaintiff's religious beliefs in non-emergency situations and, consequently, Plaintiff only begrudgingly performed such searches in emergency situations. Regardless, any distinction is immaterial to resolving the pending motion.

House AICs in accordance with their self-proclaimed "gender identity" rather
than their biological sex; and

Take a multiple-choice test in which the "correct" answers aligned with the terms
the [Defendant] deemed acceptable.

FAC ¶ 20.

Plaintiff alerted his supervisor, Lt. Clayton K. Ruble, to Plaintiff's religious objections to

the Training. FAC ¶ 21 (citing Plaintiff's letter to Lt. Ruble at Ex. B of the FAC). Specifically,

Plaintiff objected that the Training required Plaintiff to "effectively affirm[], in writing, what he

believes the Bible clearly condemns[.]" FAC ¶ 21. Lt. Ruble explained that "all departmental

staff are required to complete training as directed to ensure that we meet operational standards

and compliance with state and federal regulations." FAC ex. C. In Defendant's view, the

Training was designed to "satisfy the regulatory requirements of PREA, the expectation that all

corrections staff have a baseline of knowledge about the LGBTQ community to effectively

house this population in our jail[.]" FAC ex. C.

The parties then went back and forth on proposed accommodations. For example,

Defendant suggested Plaintiff review the Training (without answering the multiple-choice

questions) and acknowledge that while he disagreed with much of the material in the Training,

he recognized "that it is essential for law enforcement officers to communicate respectfully,

courteously, and effectively with a diverse population of individuals, including persons whose

beliefs and practices with regard to sexuality and gender differ from their own." FAC ex. C.

Plaintiff refused the proposed accommodation because Defendant's "records would

reflect that he had completed [Defendant's] Training when, in fact, he had not. For Plaintiff to

allow himself to be recorded as having completed [Defendant's] Training, when he had not

would make him a party to a lie, which the Bible prohibits." FAC ¶ 23 (internal citation omitted).

Additionally, Defendant's record of Plaintiff completing the Training would, in Plaintiff's view,

indicate that Plaintiff agreed to comply with "affirming" LGBTQI+ AICs at the jail. "To 'affirm' LGBTQI+ AICs in his care at the Jail would, in Plaintiff's view, be to 'call evil good and good evil' and thereby invite a curse, or 'woe,' upon himself in accordance with biblical teachings." FAC ¶ 24.

Plaintiff then "asked [Defendant] if he could undergo some equivalent training that aligned with his Christian beliefs." FAC ¶ 25. "Plaintiff devised his own training (the 'Alternative Training') that he felt aligned with biblical principles."[3] FAC ¶ 26 (citing ex. E to FAC). Defendant, however, "continued to demand that Plaintiff affix his signature to a copy of JP620, thereby indicating his willingness to be bound by its terms, and comply with JP620." FAC ¶ 29. Plaintiff refused, describing JP620 policies as "wicked standards I will have no part in meeting." FAC ex. G, 1. Plaintiff provided additional, specific objections which generally have little relevance to the pending motion. However, for context, here is Plaintiff's first specific, written objection to JP620:

> Transgender Booking/Custody – "*...as well as respect the sexual orientation or gender identity of any person in custody,*" – I categorically refuse to, "respect" what God in His word calls sin. All stances within the LGBTQ+ movement are sinful stances that to respect is to violate my sincerely held religious beliefs. I do respect the actual gender identity of all people. Which of course corresponds with their sex as determined by God and identified at birth.

FAC ex. G, 1 (emphasis in original).

---

[3] Plaintiff's proposed training consists of a heavily redacted and redlined copy of Defendant's Jail Procedure for "Transgender Booking/Custody." FAC ex. G. Plaintiff's edits generally consist of removing or altering any language that contrasts with Plaintiff's "traditional biblical views of sexuality or gender." For instance, Plaintiff proposed inserting "professed" before any instances of "transgender" and adding "sinful" before any use of "homosexuality" or "bisexuality." FAC ex. G, 4-7. Plaintiff proposed removing any procedure where a transgender AIC could indicate a strip search preference. Generally, Plaintiff indicated his strong preference that Defendant's policies should overlap with his own traditional biblical views while rejecting any contrary view. For example, the policy contained this definition of "Transgender person – An umbrella term for people whose gender identity (i.e., internal sense of feeling male or female) and/or gender expression differs from the sex they were assigned at birth. This may include transsexuals, cross-dressers, gender-queer, and other gender-non-conforming people. Transgender people may identify in a variety of ways, including male, female, and female-to-male (FTM), male-to-female (MTF), genderqueer, or otherwise. A transgender identified person may or may not choose to alter their bodies hormonally and/or surgically." FAC ex. G, 2-3. Plaintiff proposed a different definition: "Professed Transgender person – an umbrella term for people who live in rebellion against their God assigned gender as male or female. FAC ex. G, 4-5.

5 – OPINION AND ORDER

Plaintiff concluded by confirming his believe that "PREA standards demands [sic] we deny, [sic] God, science, and the common sense verified by our very eyes. This is a Pandora's box of perversion I refuse to help open. I appeal to you one last time, please repent of this sinful path for the sake of the county, inmates, and my fellow deputies." FAC ex. G, 3.

Given Plaintiff's refusal to affirm that he would abide by JP620, Lt. Ruble recommended that Plaintiff be suspended for one week without pay. FAC ¶ 33. Following a hearing, the Sheriff found Plaintiff violated Defendant's policies regarding insubordination (for refusing to sign a form stating he read JP620 and understands the policy) and ethical standards (for "refus[ing] to sign off on any policy that defines and recognizes 'transgender' as an identity."). FAC ex. H, 1-2. On March 27, 2023, upon returning from the one-week suspension, Defendant "immediately placed [Plaintiff] on paid administrative leave for refusing to sign and adhere to JP620." FAC ¶ 34. After another hearing, Defendant terminated Plaintiff's employment. FAC ¶ 36.

After exhausting administrative remedies, Plaintiff timely filed this action bringing six state and federal claims for religious discrimination. As noted, Defendant moves to dismiss only Plaintiff's First Amendment claims (i.e., Plaintiff's fifth and sixth claims).

## **STANDARDS**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

When considering a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. *Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. If the complaint is dismissed, leave to amend should be granted unless "the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

**DISCUSSION**

## I.    FREE SPEECH CLAIM

Plaintiff alleges Defendant "violated Plaintiff's constitutionally protected freedom of speech by attempting to compel Plaintiff to use terminology that the [Defendant] deemed acceptable – rather than terms that aligned with his sincerely held religious beliefs – when dealing with LGBTQI+ AICs housed at the Jail, then punishing him for declining to do so." FAC ¶ 82. In Plaintiff's view, his "refusal to use terms the [Defendant] deemed acceptable when dealing with AICs at the Jail who identified as LGBTQI+ - including using those AICs' self-selected names and pronouns – was a constitutionally protected activity, as the First Amendment prohibits government entities from compelling employees from speaking messages they disagree with, on religious grounds or otherwise." FAC ¶ 83. Stated differently, Plaintiff's Free Speech claim is based on Defendant's alleged retaliation for Plaintiff's refusal, based on sincerely held religious beliefs, to use terminology Defendant determined best fit its charge of respecting the Constitutional rights of all AICs in its custody.

As Plaintiff alleges that he suffered retaliation after exercising his First Amendment rights, he must establish three elements: (1) that he spoke on a matter of public concern; (2) that

he spoke as a private citizen and not as a public employee; and (3) that his protected speech was a substantial or motivating factor in the defendant's adverse employment actions. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). The failure to meet any of these elements "is fatal to the Plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (*en banc*). Here, Plaintiff's allegations confirm that he spoke not as a private citizen, but as a public employee.

"Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Eng*, 552 F.3d at 1071 (internal quotations omitted). Plaintiff's brief ignores the fact that unlike the cases he cites in support, he was a public employee and thus was subject to certain restrictions on his speech; at least to the extent that speech occurred in his role as a public employee. This is fatal to Plaintiff's Free Speech claim. Plaintiff's argument—again, focused on cases involving private citizens—ignores black-letter law recognizing that "[a] public employer 'may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large.'" *Roberts v. Springfield Util. Bd.*, 68 F.4th 470, 474 (9th Cir. 2023) (quoting *United States v. Nat'l Treasury Emps. Bd.*, 513 U.S. 454, 465 (1995)). Critically, "[a] public employee's speech is not protected by the First Amendment when it is made pursuant to the employee's official job responsibilities." *Eng*, 552 F.3d at 1071 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006)).

Although Plaintiff chooses not to address, let alone even mention *Garcetti*, the case is on point and largely controls the outcome here. Like Plaintiff, Ceballos (the Plaintiff in *Garcetti*) was a public employee (albeit as a deputy district attorney rather than a jail guard). Ceballos found "serious misrepresentations" in an officer's affidavit in support of a warrant and relayed

those concerns to his supervisors. After receiving discipline, Ceballos filed an action based on retaliation in violation of his First Amendment rights.

The Court confirmed that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417. The Court then emphasized the need to balance the public employee's First Amendment rights with the government employer's right to manage the workplace through its employees. "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id.* at 418. Ultimately, the Court "h[e]ld that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. The Court further explained its rationale:

> Our holding likewise is supported by the emphasis of our precedents on affording government employers' sufficient discretion to manage their operations. Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission. Ceballos' memo is illustrative. It demanded the attention of his supervisors and led to a heated meeting with employees from the sheriff's department. If Ceballos' superiors thought his memo was inflammatory or misguided, they had the authority to take proper corrective action.

> Ceballos' proposed contrary rule, adopted by the Court of Appeals, would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business. This displacement of managerial discretion by judicial supervision finds no support in our precedents. When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny. To hold otherwise would be to demand permanent judicial intervention

in the conduct of governmental operations to a degree inconsistent with sound
principles of federalism and the separation of powers.

* * * *

Proper application of our precedents thus leads to the conclusion that the First
Amendment does not prohibit managerial discipline based on an employee's
expressions made pursuant to official responsibilities. Because Ceballos' memo
falls into this category, his allegation of unconstitutional retaliation must fail.

* * * *

We reject, however, the notion that the First Amendment shields from discipline
the expressions employees make pursuant to their professional duties. Our
precedents do not support the existence of a constitutional cause of action behind
every statement a public employee makes in the course of doing his or her job.

*Id.* at 422–26.

Given the apparent application of *Garcetti* to the facts alleged here, the Court was rather

surprised that Plaintiff chose not to address it. The cases Plaintiff chose to rely upon are, for

various reasons, inapplicable. For instance, after acknowledging *Eng's* requirement that he must

demonstrate he spoke as a private citizen rather than a public employee, Plaintiff argues

Defendant "ignores one of the cardinal rules of free speech jurisprudence: The government 'may

not compel affirmance of belief with which the speaker disagrees.' *Hurley v. Irish-Am. Gay,*

*Lesbian, Bisexual, and Transgender Grp. Of Boston*, 515 U.S. 557, 563 (1995)." Pl.'s Opp. 8.

One need not go far, however, to conclude *Hurley* is not applicable to the facts alleged here. In

fact, the first two sentences in *Hurley* state, "The issue in this case is whether Massachusetts may

require private citizens who organize a parade to include among the marchers a group imparting

a message the organizers do not wish to convey. We hold that such a mandate violates the First

Amendment." 515 U.S. at 559. Of course, Plaintiff brings this action not as a private citizen, but

in his role as a public employee. And as the Ninth Circuit confirmed just last year, "[a] public

employer 'may impose restraints on the job-related speech of public employees that would be

plainly unconstitutional if applied to the public at large.'" *Roberts*, 68 F.4th at 474 (quoting *Nat'l Treasury Emps. Bd.*, 513 U.S. at 465).

Plaintiff next argues that *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021):

> is instructive here. In *Meriwether*, the U.S. Court of Appeals for the Sixth Circuit recognized that "the First Amendment protects the free speech rights of professors" at state universities "when they are teaching." *Id.* at 505. The Court of appeals for the Ninth Circuit [] has likewise recognized this. *See Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) [holding that the First Amendment protects 'teaching and academic writing that are performed pursuant to the official duties of a teacher and professor" (internal quotation marks omitted)]. Surely, the same principle applies, at least to some degree, in the context of law enforcement[.]

Pl.'s Opp. 8 (second bracket in original).

In the Ninth Circuit, at least, Plaintiff is surely mistaken. *See Sullivan v. Univ. Washington*, 60 F.4th 574, 582 n.6 (9th Cir. 2023) (rejecting university employees' argument that *Demers* applies "because, in performing the official work of the Committee, the members are not thereby engaged in 'teaching and academic writing.'") (quoting *Demers*, 746 F.3d at 412). Plaintiff was a jailhouse guard, not a university professor.

Finally, Plaintiff argues that his "situation is akin to that of the appellant in *Bolden-Hardge v. Off. Of the Cal. State Controller*, 63 F.4th 1215 (9th Cir. 2023). . . . Just as the Ninth Circuit found the existence of at least a possibility that the California State Controller could have reasonably accommodated the Jehovah's Witness in *Bolden-Hardge*, 63 F.4th at 1226, Plaintiff's Complaint reflects that it was possible for the [Defendant] to accommodate Plaintiff here." Pl.'s Opp. 10. Once again, Plaintiff is mistaken. As relevant here, the court in *Bolden-Hardge* only reached the merits in discussing that plaintiff's Title VII claim alleging her sincerely held religious belief conflicted with her employer's requirement that she swear to a loyalty oath. *Id.* at 1222–28. Defendant here does not move to dismiss Plaintiff's Title VII claims. Although the plaintiff in *Bolden-Hardge* brought a free exercise claim, the court expressly held that given her

11 – OPINION AND ORDER

"lack of standing for her free-exercise claim, *we lack jurisdiction to reach that claim's merits* and cannot do more than conclude that it is possible that she could state a claim by amending." *Id.* at 1221 n.1 (emphasis added).

Despite Plaintiff's attempt, intentionally or otherwise, to conflate private citizen cases with public employee cases, the fact that the dispute here concerned training regarding how Defendant processed and housed LGBTQI+ individuals—i.e., that the Training concerned how Defendant wanted Plaintiff to perform his basic job duties—demonstrates Plaintiff's free speech claim necessarily fails. "[G]enerally, 'when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Dahlia*, 735 F.3d at 1074 (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008)). Plaintiff's specific factual allegations, along with the Court's own common sense, confirm that the speech here concerned nothing more than Plaintiff's dispute with his supervisors over how to perform his job when dealing with certain AICs. Plaintiff acknowledges, as he must, that his employment "duties involved working with" LGBTQI+ AICs. FAC ¶ 12. Plaintiff concedes JP620 involved Defendant's attempts to process and protect AICs, including LGBTQI+ AICs. FAC ¶ 18. Plaintiff acknowledges that the compelled speech at issue concerned speech Defendant "deemed acceptable . . . when dealing with LGBTQI+ AICs housed at the jail[.]" FAC ¶ 82. That Plaintiff had religious objections to the compelled speech—which only involved Defendant's policies concerning how to safely and respectfully address and house certain AIC's in custody—does not somehow remove those objections from Plaintiff's employment duties.

Because Plaintiff's alleged protected speech clearly relates to his official employment duties, "such speech is categorically denied First Amendment protection." *Dahlia*, 735 F.3d at

1070 n.7; *see Eng*, 552 F.3d at 1070 n.7 (citing *Garcetti*, 547 U.S. at 426) ("A public employee's speech is not protected by the First Amendment when it is made pursuant to the employee's official job responsibilities.")). Plaintiff's First Amendment Free Speech claim is DISMISSED, with prejudice.

## II.    FREE EXERCISE CLAIMS

Plaintiff alleges Defendant violated his rights under the First Amendment's Free Exercise clause when Defendant "lent it's power to one side in a controversy over religious dogma – specifically, the controversy over whether what [sic] constitutes respectful treatment of persons who self-identify as LGBTQI+." FAC ¶ 94. This argument is meritless.

The Free Exercise clause "provides that Congress shall make no law prohibiting the free exercise of religion. The right to freely exercise one's religion freely, however, does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075 (9th Cir. 2015) (internal citations omitted) (cleaned up). Here, Plaintiff's allegations confirm that JP620 is a neutral law of general applicability. Therefore, Plaintiff's Free Exercise claim necessarily fails.

Defendant instituted JP620 "in accordance with the then-recently enacted federal Prison Rape Elimination Act ("PREA")[.]" FAC ¶ 18. Plaintiff acknowledges the policy involved Defendant's attempt to process and house certain AICs. FAC ¶ 18 (noting policy consists of Defendant's attempt to: have employees use terms that Defendant deemed inoffensive to LGBQI+ AICs; refrain from using terms Defendant deemed offensive to LGBQI+ AICs; house AICs according to the AIC self-identified gender; and conduct pat-downs of AICs). This acknowledgment comes as no surprise, as JP620 expressly provides:

**Transgender Booking/Custody**

The policy of the Douglas County Corrections Division is to ensure the respectful, courteous and professional treatment of transgender Adults in Custody (AIC), as well as respect the sexual orientation or gender identity of any person in custody, while maintaining the safety, security and orderly operation of all correctional facilities.

**PURPOSE**

To provide guidelines for the appropriate accommodations of all AICs who identify as or have been determined to be transgender. This policy is intended to address the requirements as outlined in the Prison Rape Elimination Act (PREA) standards, which require zero tolerance for discrimination on the basis of sexual orientation or gender identity.

FAC ex. A, 1.

JP620 never mentions religion. It is a standard prison policy intended to formalize how the prison will house and treat certain AICs (while complying with the constitutional rights of those AICs). One would be somewhat surprised if a prison failed to formalize how it would process and house AICs. Additionally, one would be shocked if all employees of every prison agreed with each and every policy of their employer related to the treatment of AICs. Plaintiff attempts to turn such a disagreement into a constitutional violation, arguing the fact that JP620 conflicted with some of his religious beliefs demonstrates the policy is not neutral:

JP620 is not neutral given the actions it demanded of Plaintiff: JP620 required [Defendant's] employees to treat female AICs at the Jail who self-identify as "male" even though they truly are male. This presented a problem for Plaintiff: A married man, Plaintiff has a religious conviction that he must not touch the private parts of a woman other than his wife—even women who self-identify as "male"—absent a job-related emergency that requires him to do so. Not only would such touching be the ultimate "affirmance" of a transgender-identifying AIC's self-proclaimed "gender identity," it would require Plaintiff to violate his religious calling to sexual purity – in other words, to commit what he considers an act of adultery, which the Bible condemns as sin. The Free Exercise Clause prohibits government employers from forcing their employees "to confess by word _**or act**_" their agreement with the government's orthodoxy on a given subject. [*W. Va. State Bd. Educ. v.] Barnette*, 319 U.S. [624], 642 [1943] (emphasis added).

Pl.'s Opp. 14–15.

Plaintiff's argument once again cherry picks language Plaintiff finds useful while ignoring, purposefully or not, the context of the quoted language. For example, in the quote above, Plaintiff omits the text immediately preceding the quoted text in *Barnette*. The full sentence provides:

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, ***or force citizens*** to confess by word or act their faith therein.

*Barnette*, 319 U.S. at 642 (emphasis added).

Plaintiff's attempt to conflate 'government employers forcing their employees' with "the government forcing its citizens' ignores longstanding, black-letter law recognizing that "[a] public employer 'may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large.'" *Roberts*, 68 F.4th at 474 (quoting *Nat'l Treasury Emps. Bd.*, 513 U.S. at 465). The only similarity *Barnette* has with this action is that both cases involve claims of religious freedom. Plaintiff chose to take a job with a government employer, knowing he would be required to follow his employer's policies regarding housing AICs. These facts are not analogous to Jehovah's Witnesses being compelled to salute the flag and pledge allegiance as a condition of accessing their right to a free appropriate public education.

Additionally, other than Plaintiff's argument that because he disagrees with the policy it must not be a neutral policy, there is no indication, at all, that the policy is anything other than a neutral policy of general applicability. The policy, i.e., the Training, applies to all jail employees. FAC ¶ 19 ("Via JP620, [Defendant] imposed on all of its employees a requirement that they complete . . . the Training."). As demonstrated above, the stated "PURPOSE" of JP620 was "[t]o provide guidelines for the appropriate accommodations of all AICs who identify as or have been

determined to be transgender." FAC ex. A, 1. Plaintiff specifically alleges the policy is designed

to conform with the PREA. FAC ¶ 18. The purpose of the PREA, as indicated in that Act's title,

is to eliminate prison rape. Additional purposes of the PREA include: to "establish a zero-

tolerance standard for the incidence of prison rape in prisons in the United States" and to "make

the prevention of prison rape a top priority in each prison system." 34 U.S.C. § 30302(1)–(2).

Any religious burden the policy imposes on jail employees is purely incidental.

JP620 is much like the Student Safety Plan challenged in *Parents for Privacy v. Barr*,

949 F.3d 1210 (9th Cir. 2020). There, plaintiffs raised Free Exercise challenges (amongst other

challenges) to the Plan that "allow[ed] transgender students to use school bathrooms, locker

rooms, and showers that match their gender identity rather than the biological sex they were

assigned at birth." *Id.* at 1217. Like Plaintiff here, plaintiffs in *Parents for Privacy*:

> claim that the Student Safety Plan violates their First Amendment rights to freely
> exercise their religion because the Student Safety Plan forces them to be exposed
> to an environment in school bathrooms and locker facilities that conflicts with,
> and prevents them from practicing, their religious beliefs. Specifically, the
> complaint alleges that many Student Plaintiffs and some Parent Plaintiffs "have
> the sincere religious belief" that children "must not undress, or use the restroom,
> in the presence of a member of the opposite biological sex, and also that they
> must not be in the presence of the opposite biological sex while the opposite
> biological sex is undressing or using the restroom."

*Id.* at 1233–34.

Much like JP620, the Student Safety Plan made no mention of any religious belief or

practice, or even any mention of religion at all. *Id.* at 1235. The Student Safety Plan was not

adopted "with the object of suppressing the exercise of religion." *Id.* Because no evidence

indicated the Student Safety Plan "was adopted with the specific purpose of infringing on

Plaintiffs' religious practices or suppressing Plaintiffs' religion, . . . the Student Safety Plan is

neutral for purposes of analyzing the free exercise claim." *Id.* So too with JP620.

The court next noted "the question of general applicability addresses whether a law treats religious observers unequally." *Id.* In finding the challenged policy generally applicable, the court concluded:

> Here, the Student Safety Plan is not underinclusive, because it does not require only religious students to share a locker room with a transgender student who was assigned the opposite sex at birth, nor does the Plan require only religious teachers and staff to receive training or to teach about anti-bullying and harassment. In other words, the Student Safety Plan affects all students and staff—it does not place demands on exclusively religious persons or conduct. . . . The correct inquiry here is whether, in seeking to create a safe, non-discriminatory school environment for transgender students, the Student Safety Plan selectively imposes certain conditions or restrictions only on religious conduct. Because Plaintiffs have not made any showing that the Plan does so, the district court correctly determined that the Plan is generally applicable for purposes of the free exercise analysis.

*Id.* 1236.

*Parents for Privacy* is on point and Plaintiff's specific factual allegations require the conclusion that JP620 is neutral and generally applicable.[4] That the policy may impose a disproportionate burden on jail employees who subscribe to "traditional biblical views of gender and sexuality" does not alter that conclusion. *Stormans, Inc.*, 794 F.3d at 1077. Plaintiff acknowledges Defendant instituted JP620 to comply with the Prison Rape Elimination Act. FAC ¶ 18. Because the allegations confirm that JP620 is "rationally related to a legitimate governmental purpose," Plaintiff's Free Exercise claim fails. *Id.* at 1084.

/ / / /

/ / / /

/ / / /

---

[4] For this reason, amongst a host of others, Plaintiff's citations to *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) do not help Plaintiff. There, "[b]y its own admission, the District sought to restrict Mr. Kennedy's actions at least in part because of their religious character." *Id.* at 526. Additionally, the District conceded "that its challenged directives were not 'generally applicable.'" *Id.* at 527. Because the policy there was neither neutral nor generally applicable, it was subject to strict scrutiny. *Id.* at 526. Unlike the situation in *Kennedy*, Defendant did not single out Plaintiff in enforcing JP620.

## <u>CONCLUSION</u>

For the above reasons, Defendant's Motion to Dismiss, ECF No. 9, is GRANTED.

Because the First Amended Complaint demonstrates amendment would be futile, claims five and

six are DISMISSED, with prejudice.

IT IS SO ORDERED.

DATED this 6th day of August, 2024.

_____/s/ Michael McShane_____
**Michael J. McShane**
**United States District Judge**